MELVIN HIDALGO MARRERO y MARÍA M. CAPÓ MALDONADO, demandantes y peticionarios, *v.* DEPARTAMENTO DE SERVICIOS SOCIALES, HONORABLE CARMEN SONIA ZAYAS, CARMEN LYDIA RODRÍGUEZ MEDINA y NELSON RIVERA DÍAZ, demandados y recurridos.

*Número:* CE-88-588 *Resuelto:* 17 de diciembre de 1991

606

*José Osvaldo Cotto Luna* y *María I. Cartagena Colón*, abogados de los peticionarios; *Rafael Ortiz Carrión, Procurador General, Norma Cotti Cruz, Subprocuradora General, Marjorie Rivera Rodríguez, Procuradora General Auxiliar,* y *Ariel E. González Torrents*, abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Expedimos auto de *certiorari* para revisar la resolución dictada por el Tribunal Superior que autoriza al Departamento de Servicios Sociales (en adelante Departamento) a poner en vigor un plan de visitas de forma tal que una madre pudiese, bajo la supervisión de un trabajador social, ver a su hija que había sido ubicada en un hogar de crianza desde su nacimiento. La niña fue entregada voluntariamente al Departamento por su abuelo materno para que se le cuidara mientras su madre se encontraba en la Escuela Industrial de Niñas en Ponce. Los peticionarios, padres de crianza de la menor al amparo del Programa de Hogares de Crianza del Departamento de Servicios Sociales, aducen que el Tribunal Superior se equivocó al considerar que el plan de visitas no implicaba riesgo para la menor y sostienen que no se le debe permitir a la madre biológica ver a su hija. Confirmamos la resolución recurrida, pero devolvemos el caso al foro de instancia para que evalúe si desde que el recurso se presentó ante nos ha ocurrido algún cambio social significativo en el hogar de la madre biológica que justifique alguna modificación al plan previamente aprobado.

I

Considerando la naturaleza de la controversia ante nos, procede un recuento de la historia social y procesal del conflicto que genera este recurso según se desprende de los autos originales y, en particular, de los informes de los profesionales de conducta humana que han intervenido en el caso.

Carmen Lydia Rodríguez Medina, madre de la menor que nos concierne, nació el 16 de octubre de 1968 en un medio ambiente caracterizado por la miseria, el maltrato y la disolución familiar. La madre de Carmen Lydia abandonó el hogar y, antes de que la niña cumpliera los diez (10) años, se suicidó ahorcándose. El padre de Carmen Lydia, por su parte, era alcohólico y la maltrataba físicamente. Debido a este maltrato, en 1980 Carmen Lydia fue puesta bajo la custodia de un familiar.

La vida adulta de Carmen Lydia comenzó cuando ésta apenas contaba con trece (13) años de edad. Su padre la obligó a casarse con un vecino con quien se había escapado, y para octubre de 1983 tuvo su primera hija, a quien cedió voluntariamente a la familia paterna. Aunque la prueba sobre este punto es conflictiva, aparentemente la menor sufrió daño cerebral como producto de maltrato físico. Sin embargo, Carmen Lydia aduce que nació con impedimentos.

Al entregar la custodia de su primera hija, Carmen Lydia retornó a vivir con su padre. Poco tiempo después, se fue a convivir con un grupo de machineros que trabajaban en una verbena en Guayama y comenzó a exhibir una conducta licenciosa. Finalmente, Carmen Lydia es detenida e ingresada en la Escuela Industrial de Niñas en Ponce por practicar la prostitución. Ya tenía dependencia de bebidas alcohólicas y de sustancias controladas.

Debido a que su conducta durante los primeros cinco (5) meses fue satisfactoria, se le concedió permiso para salir.

Sin embargo, tuvo que ser reingresada debido a que se desapareció de su casa. Cuando fue localizada, se revocó su libertad condicional. A su reingreso se encontraba encinta de su segundo bebé, producto de una relación amorosa con el Sr. Nelson Rivera Díaz. Mientras estaba ingresada en la institución, comenzó a exhibir problemas emocionales y tuvo que ser sometida a tratamiento siquiátrico en combinación con medicamentos. No obstante, en diciembre se le concedió un permiso para pasar la despedida de año junto a su familia. Se evadió de su hogar, fue localizada y reingresada a la institución.

El 2 de enero de 1986, en medio de un brote psicótico, Carmen Lydia dio a luz una niña a quien llamó Nahín del Carmen. Poco tiempo después, la recién nacida fue reconocida por su padre. Como su madre estaba ingresada en la institución y sufría problemas emocionales, la niña fue colocada por el Departamento en el hogar de crianza del matrimonio Hidalgo-Capó después de que el abuelo de la menor firmara una "Autorización voluntaria para colocación de niños o adultos en facilidades públicas o privadas y la prestación de servicios médicos". La misma se suscribió el 9 de enero de 1986. Ya el Departamento contaba con una pareja con quien había suscrito dos (2) convenios para recibir a la menor Nahín del Carmen en calidad de hogar de crianza subvencionado. Así es como Nahín del Carmen llega al hogar de Melvin Hidalgo y María Mercedes Capó.

Así las cosas, Carmen Lydia permaneció en la Escuela Industrial de Niñas separada de su hija, mientras la bebé vivía con sus padres de crianza. Aunque en varias ocasiones solicitó ver a su hija, solamente logró verla dos (2) o tres (3) veces. Debido a los problemas emocionales que Carmen Lydia estaba presentando, los funcionarios del Departamento consideraron prudente esperar un tiempo para formular un plan regular de visitas.

Mientras tanto, Nahín del Carmen crecía en casa de sus padres de crianza. Era objeto de infinitas atenciones y del

cariño del matrimonio Hidalgo-Capó, quienes cultivaron la relación con la niña contemplando que eventualmente iban a adoptarla. No obstante, de los informes sociales incluidos en el expediente del caso se desprende que los trabajadores sociales que visitaban a la familia Hidalgo-Capó le recordaron que la niña estaba colocada temporeramente en ese lugar bajo los términos de un hogar de crianza, y en ningún momento se inició un proceso para adoptar a la menor. Sin embargo, por su propia iniciativa, le cambiaron el nombre de Nahín del Carmen Rivera Rodríguez a Verónica Hidalgo Capó, nombre al cual la niña ya responde.

En febrero de 1987, o sea, un año y un mes después del nacimiento de Nahín del Carmen, Carmen Lydia recibió un pase extendido a la casa de su padre. Tres (3) meses más tarde, Carmen Lydia vuelve a desaparecerse del hogar paterno y tiene que ser reingresada, en estado de embarazo, en la Escuela Industrial de Niñas. En octubre de ese mismo año agredió a otra interna, por lo que fue condenada a cumplir dos (2) meses de cárcel.

De allí salió en diciembre de 1987 y fue ubicada en casa del pastor Juan Figueroa y su esposa. Dos (2) meses más tarde, nació su tercer hijo, Josael. Desde esa fecha Carmen Lydia ha vivido en los altos de la casa del pastor en compañía de su hijo. Trabaja como empleada doméstica de ciertas familias del área y en la iglesia del pastor. Un mes después de haber llegado a casa de los Figueroa, el 25 de enero de 1988 el Departamento elabora el plan de visitas a casa del abuelo de la niña, quien había manifestado interés en relacionarse con su nieta. Es precisamente este programa de visitas el que genera la controversia de autos.

Con el propósito de impedir la implantación de este plan de visitas, el matrimonio Hidalgo-Capó inició una acción civil bajo la Ley de Protección a Menores, 8 L.P.R.A. sec. 401 *et seq.*, contra la referida agencia y los padres biológicos de la menor. También solicitaron se les otorgara la custodia permanente de la menor y se iniciaran los trámites

correspondientes para la adopción eventual de la niña. El tribunal de instancia ordenó la paralización temporal del plan de visitas, mientras se preparaba un estudio social de los demandantes y del hogar del abuelo materno de la menor. También nombró a la Fiscal Especial Dalia González como defensora judicial de la menor.

Una vez iniciado el pleito, Carmen Lydia decide presentar una reconvención para reclamar sus derechos de visita y la eventual custodia de su hija. El abuelo de la menor opta entonces por que fuera Carmen Lydia quien solicitara relaciones materno-filiales con Nahín del Carmen. Después de algunos trámites procesales, las partes estipularon y se sometió como evidencia los expedientes que tenía el Departamento de la demandada, de su familia y de los padres de crianza. El 27 de mayo el tribunal anotó la rebeldía a la parte demandante en cuanto a la reconvención presentada por Carmen Lydia. Ese mismo día el tribunal comenzó a escuchar los testimonios de los distintos peritos nombrados por las partes y se pautaron vistas en junio y agosto de ese año.

El 11 de agosto el Departamento sometió un nuevo plan de visitas requerido por el tribunal de instancia. Este plan fue preparado por los trabajadores sociales del Departamento y los peritos de la parte demandada. El plan tenía el propósito de establecer las relaciones materno-filiales en dos (2) etapas de cuatro (4) meses, seguidas por evaluaciones realizadas por el personal del Departamento. La primera etapa consistía en reuniones de corta duración entre la madre biológica y su hija con la presencia de los padres de crianza, trabajadores sociales y profesionales de la conducta humana. En el cuarto mes se recomendaba dos (2) reuniones de una hora y media de duración entre Carmen Lydia y la menor bajo la supervisión de los trabajadores sociales.

Al concluir esta etapa se evaluaría la experiencia y, de estimar que los resultados eran positivos, se procedería en

la segunda etapa con reuniones en la casa de Carmen Lydia dos (2) veces al mes por períodos más largos de tiempo y bajo una estricta supervisión de dos (2) trabajadores sociales. En el séptimo y octavo mes se contemplaba la posibilidad de que la menor pernoctara en casa de Carmen Lydia. Al finalizar esta segunda etapa, se volvería a evaluar la experiencia para entonces formular un plan de mayor duración.

El 18 de agosto de 1988 la Fiscal Especial nombrada como defensora judicial de la menor informó que de la prueba vertida por la parte demandante no se había "demostrado el supuesto riesgo de maltrato que recibiría la menor de r[es]tablecerse las relaciones materno-filiales con su madre biológica". Apéndice, pág. 78. Por estas razones, recomendó que el foro de instancia ordenara la implantación del programa de visitas sometido por el Departamento y el establecimiento de las relaciones materno-filiales.

Por su parte, el Departamento informó que las visitas de seguimiento efectuadas en el hogar de Carmen Lydia demostraban que ella "continuaba exhibiendo un funcionamiento individual y familiar adecuado" y que se desempeñaba satisfactoriamente en "su respectivo rol de madre en áreas de manejo y crianza de su bebé". Véase la carta de 1ro de agosto de 1988.

Examinada la extensa prueba documental y pericial sometida, el Tribunal Superior concluyó que "no [había] riesgo alguno en comenzar con el plan de visitas recomendado por la Trabajadora Social III, Ileana M. Rivera de Bernardy y la [Trabajadora Social,] Sra. Aida Reyes de Soliván, del Departamento de Servicios Sociales, de la Oficina Local de Cayey". Apéndice, pág. 76. No obstante, en consideración a la oposición de la parte demandante, el tribunal pospuso la implantación del programa hasta tanto las partes estudiaran debidamente el documento y esta Curia hubiese resuelto el recurso de *certiorari* anunciado por los abogados del matrimonio Hidalgo-Capó.

Oportunamente, los demandantes presentaron este recurso de *certiorari* en donde se cuestiona la resolución que aprueba el plan de visitas de la menor. Examinado desde este estrado apelativo el extenso y complejo expediente de este recurso, los autos originales y los informes de los peritos de las partes, así como los excelentes alegatos sometidos, confirmamos la resolución recurrida, pero devolvemos el caso al foro de instancia para que se realicen los procedimientos descritos en esta opinión.

## II

La controversia del caso de autos es *estrictamente una limitada a determinar si una madre biológica tiene derecho a relacionarse con una hija cuya custodia ha sido temporeramente confiada a un hogar de crianza por el Departamento*. A diferencia de un litigio de relaciones paterno o materno-filiales tradicional, la pugna en este caso no es entre dos (2) ex cónyuges y tampoco implica una controversia sobre quién tiene el derecho de custodia o la patria potestad de un menor. Por el contrario, es entre una madre no custodia y las personas que mediante un convenio con el Departamento establecieron un hogar de crianza debidamente licenciado, subvencionado y supervisado por el Estado. Tampoco nos encontramos con un caso donde el Estado privó a un padre de la custodia como consecuencia de maltrato físico o emocional. En este caso, la entrega de la menor fue voluntaria debido a que a la fecha de su nacimiento su madre era una menor internada en un hogar juvenil por violar las leyes que prohíben la prostitución.

A los limitados fines de resolver si procede la implantación del programa de visitas desarrollado por los funcionarios del Departamento, se impone un breve resumen del funcionamiento y propósito del Programa de Hogares de Crianza del Departamento de Servicios Sociales.

■ La disposición legal que sirve de génesis al programa de hogares sustitutos es la Ley Núm. 3 de 15 de febrero de 1955, según enmendada, 8 L.P.R.A. secs. 68–78. Ésta sirvió de complemento a la ley aprobada por la Legislatura en 1943 que autorizaba a la División de Bienestar Público a supervisar las instituciones privadas para el cuidado de niños.

■ Los cuerpos reglamentarios que establecen los pormenores del programa de hogares sustitutos lo son el Manual de Normas y Procedimientos para los Servicios del Programa de Servicios a Familias con Niños, Departamento de Servicios Sociales, 16 de febrero de 1984, Cap. VI, y el Reglamento para el Licenciamiento y Supervisión de Hogares de Crianza Núm. 2121, Departamento de Servicios Sociales, 15 de julio de 1976, según consta inscrito en el Departamento de Estado. De ellos se desprende claramente que el Programa de Hogares de Crianza del Departamento de Servicios Sociales tiene el propósito de proveer temporeramente un hogar sustituto a un menor, mientras el Departamento rehabilita a su familia biológica y restablece las relaciones entre el menor afectado y sus padres biológicos para que éste pueda regresar a su casa.(¹)

Un hogar adecuado es el mejor sitio para el crecimiento integral y el completo desarrollo de un niño.

---

(¹) Cabe señalar que dicho esquema no emana únicamente de nuestra legislación protectora de menores. La Ley Federal de Salud y Bienestar Público, en sus disposiciones que asignan fondos a los programas de asistencia a familias con niños para los estados, Puerto Rico, Guam y las Islas Vírgenes, establece que:

"In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which—

. . . . . .

"(7) provides that the State agency will monitor and conduct periodic evaluations of activities carried out under this part;

. . . . . .

"(15) effective October 1, 1983, provides that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home ...." 42 U.S.C. sec. 671.

El servicio de hogares sustitutos es aquel que ofrece el Programa de Servicios a Familias con Niños de la Secretaría Auxiliar de Servicios a la Familia del Departamento de Servicios Sociales a niños y jóvenes cuyo hogar, por diversas circunstancias, no puede garantizarles su bienestar; y a niños y jóvenes que carecen de un hogar propio. A través de este servicio se proporciona un hogar que sustituye al propio por un período de tiempo que no debe prolongarse y que se establece de acuerdo con un plan de permanencia preparado para el niño.

Se entiende por hogar sustituto aquél que es estudiado, licenciado, supervisado y evaluado por el personal de la Secretaría Auxiliar de Servicios a la Familia a cargo de la función de licenciamiento a tono con la Ley [Núm.] 3 del año 1955, subsiguientemente enmendada y del Reglamento [Núm.] 12 de 1976 para el Licenciamiento y Supervisión de Hogares de Crianza. Manual de Normas y Procedimientos para los Servicios del Programa de Servicios a Familias con Niños, *supra*, Sec. I, pág. 1.

■ A tenor con este ordenamiento, un hogar de crianza es "el hogar de una familia que se dedique al cuidado de no más de 6 niños, provenientes de otros hogares o familias, durante las 24 horas del día, con o sin fines pecuniarios" —Sec. 1 de la Ley Núm. 3, *supra*, 8 L.P.R.A. sec. 68(5)— y que obtiene una licencia del Departamento para desempeñar esta función social. El hogar de crianza sustituye por un período de tiempo al hogar propio hasta tanto el niño retorne con sus padres o encargados o se establezca algún otro plan que atienda sus necesidades.

■ Cabe señalar que las características más importantes del hogar de crianza son: que provee cuidado y atención a un menor en un hogar y no en un ambiente institucional, y que es por un período provisional de tiempo. Esto es distinto a una adopción que es permanente y que no conlleva una fiscalización por parte de los trabajadores sociales. *Smith v. Organization of Foster Families*, 431 U.S. 816, 823–824 (1977).

■ Generalmente, el hogar de crianza es supervisado por el Departamento y recibe una subvención para los gastos de sostenimiento de un niño colocado por la agencia.

Sin embargo, también hay hogares que no reciben aportación. Para operar un hogar de crianza se necesita una licencia del Departamento, previo el cumplimiento con unos requisitos de eligibilidad que incluyen desde la presentación de un certificado de salud reciente de los miembros del hogar de crianza hasta una evaluación de las relaciones conyugales. Véase Art. IV del Reglamento, *supra.*

 Mediante reglamentación, también se establecen unas condiciones que tienen que cumplir los padres de crianza para ser acreedores a la licencia. El reglamento impone a los padres de crianza la obligación de atender y cuidar al menor como si fuera uno de sus propios hijos. Art. IV(B), Sec. 1 del Reglamento, *supra.* También requiere que ofrezcan la atención médica necesaria (íd., Sec. 2), que se aseguren de que asistan regularmente a la escuela (Art. IV, Sec. 3) y que reciban la educación especial que necesiten (íd., Sec. 4). Simultáneamente, les impone la obligación de hacer los arreglos pertinentes para que los niños reciban visitas de sus padres biológicos (íd., Sec. 10) y asistan a la iglesia de éstos (íd., Sec. 5). De esta manera, el Estado se asegura de que los hogares de crianza ofrezcan una alternativa que sustituya a su familia por un breve período de tiempo mientras el Departamento ayuda a los padres biológicos a resolver los problemas que motivaron la separación de los menores. Por considerar el hogar sustituto como un remedio provisional, se le impone la obligación de mantener ciertos vínculos con sus padres biológicos a través de visitas supervisadas por los trabajadores sociales.

Los hogares de crianza proveen sus servicios mediante un contrato suscrito con el Departamento titulado "Convenio de servicios a prestar en un hogar sustituto o en un hogar o centro de cuidado diurno". En este contrato se definen las obligaciones del hogar de crianza y expresamente se dispone la naturaleza temporal de los servicios, al convenir que los niños estarán en ese hogar de crianza hasta que el programa del Departamento así lo crea necesario.

Un menor puede llegar a un hogar de crianza o a un hogar sustituto de varias formas. Los padres biológicos del menor pueden ceder la custodia física del niño al Departamento mediante una "Autorización voluntaria para colocación de niños o adultos en facilidades públicas o privadas y la prestación de servicios médicos". Mediante este procedimiento, el niño es colocado en el hogar de crianza hasta que los padres biológicos estén capacitados para atenderlo. "En este tipo de colocación, *el padre tiene el derecho a que la agencia le devuelva su hijo cuando lo solicite y se efectúen los procedimientos de rigor.*" (Énfasis suplido.) Manual de Normas y Procedimientos para los Servicios del Programa de Servicios a Familias con Niños, *supra*, Sec. VI A, pág. 34.

La segunda manera opera cuando se activan los mecanismos provistos por la Ley de Protección a Menores y por el Reglamento Núm. 4 que la instrumenta. Cuando ocurre una de las condiciones enumeradas en la ley, el niño es removido del hogar y colocado en una institución autorizada por el Departamento para prestar este tipo de servicio. Una de estas instituciones es el hogar de crianza.

Una vez removido de su hogar, ya sea voluntaria o involuntariamente, el Departamento está obligado a supervisar el funcionamiento del hogar de crianza, a proveer tratamiento de rehabilitación a la familia biológica del menor y a elaborar un programa a largo plazo sobre la residencia permanente del menor conocido como el "plan de permanencia". La estadía del menor en el hogar de crianza no debe ser mayor de dos (2) años. Manual de Normas y Procedimientos para los Servicios del Programa de Servicios a Familias con Niños, *supra*, Sec. II 1, págs. 5–7. Sin embargo, en algunos casos estas normas no son estrictamente implantadas, resultando en estadías excesivamente largas en los hogares sustitutos sin una previa autorización administrativa o judicial. Véanse: 42 U.S.C. sec. 675(5)(B); Vega, *Factors Associated with Children's Length*

*of Stay in Foster Family Care in Puerto Rico*, Tesis doctoral inédita, Escuela Graduada de Servicio Social, Universidad de Fordham, 1990; D.J. Besharov, *The Misuse of Foster Care: When the Desire to Help Children Outruns the Ability to Improve Parental Functioning*, 20 (Núm. 2) Fam. L. Q. (1986).

El plan de permanencia es la médula del servicio de hogares de crianza. Este plan debe establecerse desde que el niño es colocado en el hogar de crianza de forma tal que desde el inicio el niño sepa cuánto tiempo va a estar fuera de su hogar biológico y cuál es el objetivo de la colocación. *Prevalece a través de toda la reglamentación la filosofía de que el plan de permanencia ideal para todo niño removido de su hogar biológico es el retorno con sus padres.*

Es en función de este plan de permanencia que se establecen las visitas entre los niños y sus padres biológicos, según lo requiere la reglamentación vigente. El ordenamiento dispone expresamente en el Art. IV(B), Sec. 10 del Reglamento Núm. 2121, *supra*, pág. 5, que existe un derecho de visita de los padres biológicos, excepto en circunstancias "en que el Tribunal Superior o el Trabajador de Servicios [Sociales] determine que las mismas no son convenientes". La premisa inarticulada de esta disposición es que existe una presunción de que los padres biológicos tienen derecho de visita, y que sólo cuando no sea saludable para el desarrollo del niño es que se pueden limitar o prohibir las visitas. La frecuencia, la duración y el lugar de las visitas van a estar grandemente influenciadas por los planes de permanencia que el Departamento tenga para ese menor. A tenor con esta norma rectora, el trabajador social asignado al caso está obligado a preparar un plan de visitas para cada menor en un hogar de crianza y a supervisar su implantación:

El trabajador de Servicios de la Oficina Local de procedencia establecerá por escrito el plan de visitas de los padres o encar-

gados a sus hijos y hará llegar copia del mismo a todas las partes envueltas, a los padres, al hogar de crianza, a la Oficina Local que atiende al niño. En caso de surgir problemas en el desarrollo del plan de visitas el mismo será revisado. El Trabajador de Servicios que atiende al niño así como el de la Oficina Local de procedencia pueden solicitar una revisión del plan. Manual de Normas y Procedimientos para los Servicios del Programa de Servicios a Familias con Niños, *supra*, Sec. XIV, págs. 94–95.

No cabe duda entonces que, como corolario fundamental a la política de que los menores deben retornar al hogar biológico, un padre tiene el derecho de relacionarse o de visitar a un hijo que está en un hogar de crianza. Sólo cuando el plan de visitas implique riesgos para el menor se podrá limitar o prohibir el mismo. Así expresamos en *Sterzinger v. Ramírez*, 116 D.P.R. 762, 775 (1985):

El derecho a mantener relaciones con sus hijos es tan importante que los tribunales pueden regular las relaciones paternofiliales, pero no pueden prohibirlas totalmente, a menos que existan causas muy graves para hacerlo.

Examinado el derecho relevante a los hogares de crianza, apliquémoslo a estos hechos particulares.

## III

Al evaluar el caso de autos, recordemos que la menor fue colocada en el hogar de crianza mediante una entrega voluntaria hecha por el abuelo. Por sus circunstancias particulares, él no podía hacerse cargo del cuidado temporero de la recién nacida mientras su madre se encontraba internada en el hogar juvenil para menores delincuentes por el delito de prostitución.

También partimos de la premisa de que el matrimonio Hidalgo-Capó suscribió dos (2) convenios con el Departamento en los que expresamente reconoció el carácter temporero de sus servicios hacia la menor. En particular, en el

convenio suscrito el 23 de enero de 1986 ellos reconocieron que habían sido debidamente orientados sobre la diferencia entre ser padres adoptivos o de crianza. Además, aceptaron a la menor en calidad de padres de crianza después de una explicación de "que la menor no está siendo considerada como candidata a adopción" y que conocían sus obligaciones según definidas por el reglamento promulgado por el Departamento. Por otro lado, conscientes de sus responsabilidades, ellos aceptaron la subvención mensual del Estado y la estrecha supervisión de los trabajadores sociales que tenían asignado este caso.

En este contexto es evidente que el Reglamento para el Licenciamiento y Supervisión de Hogares de Crianza y los estatutos pertinentes referentes a las obligaciones de las personas que tienen una licencia para operar un hogar de crianza, forman parte del contrato entre el matrimonio Hidalgo-Capó y el Departamento. El convenio suscrito entre ellos así lo incorpora. No olvidemos que nuestro ordenamiento civil dispone que "[l]as obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes, y deben cumplirse al tenor de los mismos". 31 L.P.R.A. sec. 2994. Véase *Selosse v. Fund. Educ. Ana G. Méndez*, 122 D.P.R. 534 (1988).

A tenor con nuestro ordenamiento, los hogares de crianza tienen que cumplir con los requisitos establecidos por ley o por reglamentos para poder continuar operando con una licencia del Departamento. Entre estos requisitos, el reglamento dispone:

IV. (B) Condiciones que cumplirán los padres de crianza.

. . . . . . . .

Sección 10. Los niños colocados recibirán visitas de sus padres y/o parientes, excepto en aquellas situaciones en que el Tribunal Superior o el Trabajador de Servicios determine que las mismas no son convenientes. En esos casos los padres de crianza harán los arreglos pertinentes para que el niño visite a sus padres. Art. IV(B), Sec. 10 del Reglamento Núm. 2121, *supra*, pág. 5.

Conscientes de sus obligaciones según este ordenamiento, el matrimonio inicialmente aceptó que la niña visitara a su madre mientras ésta estaba ingresada en la institución. El Departamento preparó entonces un plan regular de visitas, originalmente a casa del abuelo y posteriormente a casa de la madre biológica. Sin embargo, el matrimonio Hidalgo-Capó recurrió al Tribunal Superior para impedir su implantación. A tenor con el Art. IV(B), Sec. 10 del Reglamento núm. 2121, *supra*, los padres de crianza tenían acción legitimada para recurrir al foro judicial para dirimir la conveniencia y adecuacidad de un plan de visitas de los padres o parientes de los niños colocados en sus hogares.

A pesar de que el Tribunal Superior modificó el plan de visitas inicialmente preparado por los trabajadores sociales, el matrimonio Hidalgo-Capó aduce ante nos que el mismo continúa poniendo a la menor en riesgo de sufrir daño físico o emocional. Aunque es encomiable el cuidado y la atención desplegada por los Hidalgo-Capó sobre la menor bajo su custodia, coincidimos con el Tribunal Superior en que los peticionarios no han demostrado que el plan de visitas diseñado por los trabajadores sociales y sicólogos familiarizados con el historial social de la menor constituye un riesgo para su salud o su seguridad.

Nuevamente recordemos que la madre biológica lo único que reclama en estos momentos es establecer las relaciones materno-filiales. Así lo acepta su representación legal en sus escritos ante nos, limitando la controversia a determinar si el plan de visitas aprobado por el Tribunal Superior constituye un riesgo para la menor. Por su parte, la decisión del Tribunal Superior se limita a aprobar el plan de visitas y no hay ninguna determinación sobre un cambio en la custodia de la menor. Veamos por qué, en este momento en particular, el plan de visitas no conlleva riesgo para la menor.

Como primera barrera a la teoría de los Hidalgo-Capó,

se levanta el proceso de rehabilitación de Carmen Lydia. No cabe la menor duda de que en el pasado Carmen Lydia llevó una vida que ni remotamente podemos catalogar como ejemplar. Sin embargo, tenemos que reconocer que las circunstancias familiares que rodearon su niñez y pubertad no fueron las más idóneas. El expediente está plagado de situaciones y sucesos que así lo constatan. Su situación emocional también atravesó serias crisis. La prueba pericial, en ocasiones conflictiva, así lo demuestra.

No obstante, después de contar con el beneficio del testimonio pericial de varios profesionales de la salud mental, el foro de instancia concluyó que el plan cuidadosamente elaborado por los trabajadores sociales y sicólogos no ponía en riesgo la salud de la menor y que el bienestar de Nahín del Carmen quedaría bien servido si se implantaba el programa de visitas.

A estos efectos, son particularmente reveladoras las expresiones vertidas sobre Carmen Lydia en el último informe social preparado a instancias del Tribunal Superior:

> Carmen Lydia no ha experimentado desorden de ninguna índole en su conducta, considerando los antecedentes de [su] condición emocional y recomendaciones de tratamiento psiquiátrico que se poseen de evaluaciones anteriores.
>
> La misma funciona satisfactoriamente en su rol de madre en términos del manejo y crianza de su bebé de tres meses el cual se observa muy bien atendido por su madre. Carmen L. interesa también mantener relaciones materno filiales con su hija Nah[í]n del C.Rivera, la cual se encuentra en el Hogar de Crianza Hidalgo Capó.
>
> Consideramos muy respetuosamente y somos de la opinión que este Honorable Tribunal le debe brindar la oportunidad a Carmen Lydia de relacionarse con su hija. De continuar exhibiendo ésta un funcionamiento satisfactorio, no se le debe de Privar de la Custodia y Patria Potestad que ella ejerce sobre su hija.
>
> Por todo lo antes expuesto solicitamos: Que se conceda al Departamento de Servicios Sociales, un período de tiempo de seis(6) meses, para la elaboración de un plan estructurado de servicios con Carmen Lydia en las áreas de relaciones materno

filiales, atención y supervisión de menores, situación económica[,] vivienda, etc. Que en dicho lap[s]o de tiempo se evaluará el funcionamiento social familiar de Carmen Lydia, a los fines [de] estar en disposición de emitir recomendaciones claras y precisas sobre la custodia de la menor, sin menoscabar su capacidad y fortaleza como madre. Apéndice, pág. 146.

La capacidad de Carmen Lydia para atender a Nahín del Carmen es confirmada adicionalmente por la evaluación psicológica hecha con la intervención del Departamento. En su resumen y recomendaciones, la Sicóloga Sonia Santiago-Becerra concluyó que:

Carmen Lydia es una joven mujer que tal parece que antes de convertirse en mujer, tuvo que ser madre sin contar con las destrezas emocionales y de madurez que se requieren para llevar a cabo con responsabilidad este rol.

Tal parece que al presente y luego de encontrar unas figuras paternas adecuadas, las cuales parecen haberle dado el apoyo y sostén que tanto necesitó de sus padres biológicos, pudo percatarse de su realidad.

Es por ello que se recomienda:

1. Se contin[ú]e brindándole todo tipo de ayuda económica y moral para que pueda hacerse cargo efectivamente de la crianza de sus hijos.

2. Se le haga responsable de la crianza de sus dos hijos más pequeños, como voto de confianza que le permita reconocer que siempre que su conducta refleje el juicio social adecuado podrá gozar de privilegios. Apéndice, págs. 149–150.

Dijo además la Trabajadora Social Marisol Rodríguez:

A la luz de la información recopilada y la situación, observamos a una madre bien motivada hacia cuidar y proteger a su bebé. Interesa también mantener relaciones con su hija de dos años colocad[a] en el hogar de crianza de Cayey, ya que ahora tiene un hogar aparentemente estable y un hijo bajo su cuidado. Recomendamos que se le brinde la oportunidad de criar a sus hijos. Esto debe pasar por el proceso de frecuentes relaciones materno-filiales con la niña de 2 años para iniciar la adaptación entre éstas. Luego pueden coordinarse pases y después pases frecuentes hasta completar el proceso de readaptación.

624

Se le debe dar una oportunidad para que esta madre aprenda que tiene una responsabilidad para con sus hijos. Que además logre desenvolverse a cabalidad en este rol y ofrecer a éstos los cuidados y atenciones necesarias que redunden en un desarrollo integral saludable, tanto en el aspecto de salud física como emocional. Apéndice, pág. 140.

Como segunda barrera para proteger a Nahín del Carmen de sufrir algún tipo de daño físico o emocional, se levanta el cuidadoso plan de visitas preparado por los expertos del Departamento.(²) El siquiatra, inicialmente, y

---

(²) El plan fue preparado por el Dr. Víctor José Lladó Díaz, la Dra. Lourdes Cruz Matos y las Trabajadoras Sociales S. Magda Brisueño y Carmen G.R. de Rodríguez. En el mismo se proponían las siguientes visitas:

19 de agosto de 1988 – Reunión entre los padres de crianza, la madre biológica y dos (2) trabajadoras sociales en la oficina local de Departamento de Servicios Sociales de Cayey. Un profesional externo evaluaría la dinámica. La menor no estaría presente. Duraría una hora.

31 de agosto de 1988 – Reunión en el mismo lugar y con las mismas personas. Esta vez Nahín del Carmen estaría presente. Duraría entre una hora a hora y media.

8 de septiembre de 1988 – Reunión en la oficina local del Departamento de Servicios Sociales en San Juan. Asistirían la menor y sus padres de crianza, la madre biológica y dos (2) trabajadoras sociales. Duraría de una hora a hora y media.

15 de septiembre – Reunión en la oficina local del Departamento de Servicios Sociales de Cayey entre las mismas personas anteriormente mencionadas. Duraría aproximadamente lo mismo que las anteriores.

22 de septiembre de 1988 – Se llevaría a cabo en el hogar de Carmen Lydia. Estarían presentes los padres de crianza, la menor, su madre biológica y las trabajadoras sociales. Tendría la misma duración que las anteriores.

29 de septiembre de 1988 – Se llevaría a cabo en la oficina local de Departamento de Servicios Sociales de Cayey. Se espera estuvieran presentes los padres de crianza, la menor, la madre biológica y los trabajadores sociales. Tendría la misma duración que las anteriores.

6 y 19 de octubre de 1988 – Ambas reuniones se llevarían a cabo en casa de la madre biológica. Sin embargo, tendrían una duración mayor que las anteriores. Se extenderían de dos (2) a tres (3) horas. Estarían presentes las personas indicadas anteriormente.

10 y 23 de noviembre de 1988 – Ambas reuniones se llevarían a cabo en la oficina local del Departamento de Servicios Sociales de Cayey. Tendrían una duración de una hora a hora y media. Sería la primera reunión donde no estarían presentes los padres de crianza de la menor. Asistirían únicamente la menor y su madre biológica y ambas trabajadoras sociales.

Al concluir estos cuatro (4) meses se recomienda una evaluación del proceso. Se compartirían experiencias y se consideraría la posibilidad de comenzar una segunda etapa para intensificar las relaciones materno-filiales.

7 y 21 de diciembre de 1988 – Se le serían concedidos a la niña pases de tres (3) horas a la casa de su madre biológica. Durante este tiempo la madre tendría que estar continuamente con su hija. Serían supervisadas por las encargadas del caso. Se comenzaría a considerar la posibilidad de dejar solas a la niña y a su madre.

los trabajadores sociales, subsiguientemente, velarán por que no ocurra ningún tipo de perjuicio a la niña.

Por otro lado, tampoco podemos aceptar la posición de los peticionarios de que privemos a Carmen Lydia del derecho de visita y de patria potestad que tiene sobre su niña y de que la liberemos para una eventual adopción. Hacer lo que los peticionarios proponen tendría el efecto de enmendar judicialmente los mecanismos provistos por ley para regular el Programa de Hogares de Crianza del Departamento de Servicios Sociales y representaría una actuación contraria a nuestros pronunciamientos en *Sterzinger v. Ramírez*, supra. Si bien es cierto que en aquel caso estábamos ante un pleito entre dos (2) padres biológicos y ante una familia con recursos económicos amplios y más cercana al esquema tradicional que conocemos, no podemos penar a una madre prohibiéndole relacionarse con su hija porque unos padres de crianza cuentan con más recursos económicos. Ese no puede ser el criterio. Negarle a Carmen Lydia relacionarse con su hija tendría, en efectos prácticos, la consecuencia de arrebatarle permanentemente a su hija debido a que los vínculos afectivos serían difíciles de establecer en etapas posteriores. No se ha demostrado que ello se justifique.

Además, "se ha resuelto que es deber del estado tratar de rehabilitar las relaciones deterioradas entre el padre y sus hijos menores y que no se puede privar permanentemente de la patria potestad a un padre, sin que se demuestre a satisfacción del tribunal que el estado se esforzó por reunificar la familia por medio de los organismos del go-

---

3 y 26 de enero de 1989 – Para este mes se considerarían pases de todo un día. Comenzarían a las 9:00 ó 9:30 A.M. hasta las 4:00 P.M. Los padres de crianza no estarían presentes en estos pases.

10 y 24 de febrero de 1989 – La menor pernoctaría por primera vez en casa de su madre. Las trabajadoras sociales de la oficina local de Cayey la llevarían a San Juan, dormiría en casa de su madre y, al otro día, la trabajadora social de San Juan la llevaría a Cayey.

10 y 24 de marzo de 1989 – Se seguiría el mismo procedimiento que en febrero.

bierno para esos fines". E. González Tejera, *Bienestar del menor: señalamientos en torno a la patria potestad, custodia y adopción*, en *Cambios sociales y nuevos enfoques en el derecho de familia*, Centro de Investigaciones Sociales, Universidad de Puerto Rico, 1984, pág. 29. Véase *Santosky v. Kramer*, 455 U.S. 745 (1982).

En *Smith v. Organization of Foster Families*, supra, el Tribunal Supremo de Estados Unidos examinó cuidadosamente el conflicto entre el derecho fundamental de los padres biológicos de un menor frente al de los custodios temporeros de un hogar de crianza. Sobre estos extremos, el Tribunal proclamó la preeminencia de los derechos de los padres biológicos:

> Whatever liberty interest might otherwise exist in the foster family as an institution, that interest must be substantially attenuated where the proposed removal from the foster family is to return the child to his natural parents. *Smith v. Organization of Foster Families*, supra, págs. 846–847.

Por todas estas consideraciones, coincidimos con el Tribunal Superior de que el cuidadoso plan de visitas elaborado por los trabajadores sociales del Departamento y los sicólogos que asistieron al foro de instancia no representa un riesgo para la menor. Este plan provee una supervisión intensa de las visitas de la madre y un proceso continuo de evaluación que, de surgir algún problema, permitirá los ajustes correspondientes para salvaguardar el bienestar de la menor.

No obstante, considerando el tiempo transcurrido desde que se formuló el plan, procede que antes de su implantación el Tribunal Superior ordene que el Departamento prepare un informe suplementario de la situación de la madre biológica para determinar si ha surgido algún cambio significativo que requiera una revisión de su anterior dictamen. Además, por un término razonable, el Tribunal Superior deberá retener la jurisdicción sobre este caso y

requerir informes periódicos del Departamento sobre el desarrollo del plan de visitas y, en particular, de los cambios ocurridos al concluir las dos (2) etapas del proceso.

Con estas modificaciones, *confirmamos la resolución recurrida y ordenamos la devolución del caso al Tribunal Superior para ulteriores procedimientos conforme lo expuesto anteriormente.*