EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Lydia Rivera Báez<br>Luis Maldonado Pola<br><br><br>Ex Parte | Certiorari<br><br>2007 TSPR 56<br><br>170 DPR _____ |

Número del Caso: CC-2006-219
        Cons. con  AC-2006-13

Fecha: 26 de marzo de 2007

Tribunal de Apelaciones:

                Región Judicial de Fajardo

Juez Ponente:

                Hon. Andrés Salas Soler

Abogada del Departamento de la Familia:

                Lcda. Lisa M. Alverio


Abogados de la Parte Interventora, Alejandro Cruz Albarranz y Ana Desi Medero:

                Lcda. Sylvia Juarbe Berríos
                Lcdo. Enrique Miranda Merced

Abogados de Lydia Rivera Báez y Luis Maldonado Pola:

                Lcdo. Ángel R. Matos González
                Lcda. Sandra E. Guasp Sánchez

Materia: Adopción; Plan de Permanencia


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Lydia Rivera Báez
Luis Maldonado Pola

                              CC-2006-219

Ex Parte                      Cons. con
                              AC-2006-013

Opinión del Tribunal emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 26 de marzo de 2007

Nos corresponde determinar si procede desestimar una petición de adopción de los padres de crianza de una menor, cuando ésta se presentó antes de que el tribunal de instancia hiciera una determinación final, bajo la Ley de Bienestar Integral de la Niñez, sobre el plan de permanencia de dicha menor que se encuentra bajo la custodia del Departamento de la Familia. A la luz de los hechos del presente caso, contestamos en la afirmativa.

**I.**

**A.**

CC-2006-219 Cons. con44
AC-2006-13

La menor NACV nació el 2 de mayo de 2003 en el Hospital de la Universidad de Puerto Rico de Carolina. Debido a que su madre, la señora Suhail

Vélez, no obtuvo cuidado pre-natal y utilizó marihuana durante los primeros meses de gestación, la menor fue prematura, nació bajo peso y con varios padecimientos de salud incluyendo el Síndrome de Retirada. Por su parte, el señor Alexander Cruz Medero, padre de la menor, admitió ser usuario de heroína.

El trámite judicial del presente caso comenzó el 27 de mayo de 2003. En dicha fecha, el Departamento de la Familia (el "Departamento") presentó una petición de emergencia ante el Tribunal de Primera Instancia en la que solicitó la custodia provisional de la menor NACV ("la menor"), al amparo de la hoy derogada Ley 342 del 16 de diciembre de 1999 conocida como la Ley para el amparo a menores en el Siglo XXI", 1999 Leyes de Puerto Rico 1511-1571. En esencia, el Departamento alegó que la menor corría peligro porque se sospechaba que sus padres eran usuarios de sustancias controladas. Luego de presentada la referida petición de emergencia, el foro primario privó a los señores Suhail Vélez y Alexander Cruz Medero de la custodia de la menor y otorgó la custodia provisional de ésta al Departamento de la Familia. Ordenó además que la menor fuese colocada de forma provisional en un hogar sustituto debidamente certificado por el Departamento.

Antes de solicitar la custodia provisional de la menor, la trabajadora social a cargo del caso, la señora Yolanda Pizarro Quiñones, realizó varias gestiones para ubicarla con sus familiares. Como parte de dichos

esfuerzos, la señora Pizarro se comunicó con el abuelo paterno de la menor, el señor Alejandro Cruz. En ese momento, los abuelos paternos de la menor, los esposos Cruz-Medero, no pudieron asumir la custodia de su nieta porque tenían la custodia legal de su hermanito quien para esa fecha tenía tres (3) años de edad y también era hijo de la señora Suhail Vélez y el señor Alexander Cruz Medero.

Ante esta situación, el Departamento procedió a colocar a la menor NACV en el hogar de crianza de los señores Luis Maldonado Pola y Lydia Rivera Báez ("señores Maldonado-Rivera"). Luego de remover a la menor de su hogar, se celebraron varias vistas de seguimiento en el caso de maltrato número NSRF 2003-00685. En dichas vistas, la trabajadora social presentó los correspondientes informes sociales sobre la condición de la menor y sus padres.

En su informe del 3 de junio de 2003, la trabajadora social recomendó que el Departamento de la Familia continuara con la custodia provisional de la menor y que los padres biológicos se sometieran a un plan de servicios dirigido a que éstos se rehabilitaran. En dicha ocasión, indicó que el plan permanente del Departamento era que ésta regresara a su hogar biológico.

Debido a que los padres de la menor no demostraban capacidad para recuperarla, en la vista del 15 de julio de 2003, el Departamento solicitó que se preparara un plan de

adopción.[1] *Véase,* Apéndice de Recurso de *certiorari*, caso núm. CC- 2006-29, Anejo V.  En dicha vista, el tribunal de instancia determinó que la remoción de la menor se había hecho conforme a derecho, anotó rebeldía a los padres y señaló vista para el 19 de agosto de 2003.  Para esa fecha, el plan permanente del Departamento de la Familia seguía siendo el retorno de la menor a su hogar biológico sujeto a que los padres se rehabilitaran.

En el informe social preparado por la señora Yolanda Pizarro para la vista del 19 de agosto de 2003, se indicó que aunque el plan de permanencia vislumbraba retornar a la menor a su familia biológica, si en tres (3) meses sus padres no demostraban interés en recuperarla, el Departamento consideraría acoger un plan concurrente de adopción.

El 16 de diciembre de 2003, el Tribunal de Primera Instancia celebró una vista de seguimiento de remoción de custodia a la cual el padre de la menor compareció sin representación legal.  En dicha vista, el Tribunal de Primera Instancia dictó sentencia parcial en la que le concedió al señor Alexander Cruz un término adicional para ingresar a un programa de rehabilitación.  Sin embargo, ante la falta de interés de la madre de la menor en cumplir con el plan de servicios, el tribunal eximió al

---

[1] Sin embargo, no surge de la referida minuta que el Tribunal de Primera Instancia tomase una determinación sobre la implementación de un plan de adopción para la menor.

Departamento de Familia de realizar esfuerzos razonables en cuanto a ésta.

Así las cosas, el 23 de diciembre de 2003, los abuelos paternos de la menor solicitaron permiso para visitarla y llevarle un regalo de navidad. La visita se llevó a cabo ese mismo día. Posteriormente, el 3 de febrero de 2003, el señor Alejandro Cruz, abuelo paterno, le informó a la trabajadora social a cargo del caso que los padres de la menor continuaban frecuentando lugares en los que se venden sustancias controladas y que luego de tener un altercado con su hijo, solicitó y obtuvo una orden de protección en contra de éste.

El 16 de marzo de 2004, se celebró una vista de seguimiento a la cual el señor Alexander Cruz, compareció con representación legal. En el informe presentado en dicha vista, la trabajadora social recomendó concederle un tiempo adicional al padre para rehabilitarse. De esto no ser posible, se recomendó adoptar un plan concurrente de privación de patria potestad para permitir la adopción de la menor. Luego de escuchar el testimonio del padre y con el beneficio de la prueba presentada, el tribunal eximió al Departamento de la Familia de realizar esfuerzos razonables en cuanto a éste.

El 7 de mayo de 2004, la señora Yolanda Pizarro se comunicó con la señora Ana Daisy Medero, abuela paterna de la menor NACV. En dicha ocasión, la señora Medero indicó que deseaba obtener la custodia legal de su nieta. En

atención a esto, en el informe preparado para la vista del 18 de mayo de 2004, la trabajadora social solicitó que se le otorgara la custodia legal permanente de la menor a los esposos Cruz-Medero. Para esta fecha, la menor NACV tenía un año de edad y todavía vivía con sus padres de crianza.

Por otra parte, el 27 de junio de 2004, el abuelo paterno de la menor acudió a la oficina del Departamento de la Familia e indicó que tanto él, como su esposa, deseaban acoger a la menor en su hogar. En el informe preparado por la trabajadora social para la vista pautada para el 17 de agosto de 2004, dicha funcionaria indicó que los abuelos de la menor estaban dispuestos a asumir la custodia legal de ésta y que el Departamento había concluido que ellos eran un recurso adecuado para hacerse cargo de la menor. En su informe, la señora Pizarro solicitó se privara a los padres de la patria potestad de la menor e indicó que el Departamento estaba en la disposición de evaluar recursos familiares para la menor. De igual modo, la trabajadora social Olga Algarín Ortiz preparó un informe social sobre el trasfondo económico, social, de salud y familiar de los esposos Cruz-Medero. En dicho informe, recomendó que éstos obtuviesen la custodia de su nieta.

El 17 de agosto de 2004, el tribunal de instancia celebró una vista de seguimiento y privación de patria potestad a la cual no asistieron los padres de la menor ni sus abuelos paternos. Debido a que los padres nunca cumplieron con los planes de servicios establecidos por el

Departamento de la Familia, el foro primario dictó sentencia en la que privó tanto al señor Alexander Cruz Medero, como a la señora Suhail Vélez de la patria potestad sobre su hija menor de edad. El tribunal otorgó la custodia legal de la menor NACV al Departamento de la Familia. A instancias de la representante legal del Departamento de la Familia, el tribunal decretó el cierre y archivo del caso. Sin embargo, el tribunal nada dispuso sobre la custodia física de la menor. Tampoco pautó una vista para discutir el plan de permanencia de ésta, como correspondía.

**B.**

Luego de que el tribunal privara a los padres del ejercicio de la patria potestad sobre la menor NACV, comenzó la etapa procesal del presente caso en la que tanto los abuelos de la menor, los esposos Cruz-Medero, como sus padres de crianza, los señores Maldonado-Rivera, comenzaron una batalla judicial encaminada a obtener la custodia de la menor.

El 27 de septiembre de 2004, los señores Maldonado-Rivera, presentaron una petición de adopción ante el Tribunal de Primera Instancia, Sala Superior de Fajardo. Este caso de adopción fue identificado con el número NSRF 2004-001132 y es el caso que mediante sendos recursos de *certiorari*, presentados por el Departamento de la Familia y los esposos Cruz-Medero, está ante nuestra consideración.

Mientras la petición de adopción de los padres del hogar de crianza estaba ante la consideración del tribunal de instancia, el 9 de noviembre de 2004, los abuelos paternos de la menor presentaron una demanda en contra del Departamento de Familia en la que solicitaron la custodia de la menor. Además, solicitaron que se paralizara el procedimiento de adopción iniciado por los señores Maldonado-Rivera. Este nuevo caso de custodia fue identificado con el Número NSRF-2004-1287. Por otro lado, el 4 de enero de 2005, los esposos Cruz-Medero presentaron una "Moción solicitando se establezcan relaciones abuelo[-]filiales". Además, solicitaron intervenir en el pleito de adopción del hogar de crianza.

Por su parte, el Departamento de la Familia contestó la demanda de custodia el 8 de marzo de 2005. Solicitó que se desestimara la misma y se reabriera el caso de maltrato en el cual se le otorgó la custodia legal permanente de la menor. Además, solicitó que se paralizara el procedimiento de adopción iniciado por los padres crianza y que se señalara una vista para discutir el plan de permanencia.

En vista de lo anterior, el tribunal ordenó a la Procuradora de Asuntos de Familia que expresara su posición en torno a la demanda de custodia presentada por los esposos Cruz-Medero. El 28 de febrero de 2005, la Procuradora compareció en el pleito de custodia. Indicó que desde el comienzo del caso de maltrato los abuelos se negaron a asumir la custodia de la menor. Además, se opuso

a la solicitud de custodia y relaciones abuelo-filiales e indicó que no favorecía que el tribunal ordenase un estudio de custodia en el que se considerara a los esposos Cruz-Medero como recursos disponibles. Finalmente, alegó que no procedía paralizar el pleito de adopción y se opuso a que se le otorgara a los abuelos la custodia provisional de la menor.

El 2 de agosto de 2005, se celebró una vista en el caso de custodia. Los abuelos paternos, por conducto de su representación legal, solicitaron se les concediera la custodia de la menor pero la Procuradora se opuso a dicha petición pues entendió que procedía esperar que culminara el procedimiento de adopción presentado por los padres de crianza. El Departamento de la Familia indicó que procedía desestimar tanto el caso de custodia como el de adopción porque ambos eran prematuros. Argumentó que se debía reabrir el caso de maltrato.

En el ínterin, el pleito de adopción presentado por los señores Maldonado-Rivera, siguió su curso ante el tribunal de instancia. El 4 de abril de 2005, el Departamento de la Familia presentó una moción de desestimación en dicho pleito. Señaló en su moción que desde el mes de mayo de 2004, los abuelos paternos habían mostrado interés en asumir la custodia de la menor cuando se enteraron que los padres de ésta serían privados de la patria potestad. Además, el Departamento alegó que cuando el tribunal privó a los padres de la patria potestad sobre

la menor, sus funcionarios estaban evaluando la capacidad de los abuelos paternos para asumir la custodia de la menor.

Así las cosas, el 29 de marzo de 2005, el tribunal de instancia emitió resolución en el caso de adopción en la cual denegó la solicitud de intervención presentada por los abuelos paternos y limitó su comparecencia a ser oídos.

El 24 de mayo de 2005, se celebró la vista en su fondo sobre el caso de adopción. En dicha vista, la representante legal del Departamento de la Familia alegó que luego de la vista de privación de patria potestad no procedía cerrar el caso, sino señalar una vista para discutir el plan de permanencia. Sin embargo, la Procuradora de Asuntos de Familia argumentó que procedía continuar con el procedimiento de adopción. Luego de escuchar a las partes, el tribunal declaró no ha lugar la moción de desestimación presentada por el Departamento y ordenó que se continuara con el procedimiento de adopción, acogiendo la posición expresada por la Procuradora. La vista de adopción quedó pautada para el 10 de junio de 2005.

Por otro lado, el 7 de junio de 2005, los abuelos paternos presentaron dos peticiones de adopción; una dentro del mismo pleito de adopción de los padres de crianza (Civ. Número NSRF 2004-01132); y otra independiente a la cual se le asignó el número NSFR 2005-647.

Posteriormente, el 10 de junio de 2005, el Departamento de la Familia acudió al Tribunal de Apelaciones, mediante una Solicitud de *certiorari*, Moción en auxilio de jurisdicción y Solicitud de paralización de vista de adopción. En su recurso de *certiorari*, el Departamento alegó que el tribunal de instancia había errado al declarar no ha lugar la moción de desestimación presentada en el caso de adopción.

El Tribunal de Apelaciones declaró con lugar la moción en auxilio de jurisdicción y paralizó la vista de adopción pautada para el 10 de junio de 2005. El 16 de agosto de 2005, dicho foro declaró con lugar una moción de intervención presentada por los abuelos paternos de la menor. Por su parte, los señores Maldonado-Rivera, comparecieron ante el foro apelativo mediante recurso de *certiorari* el 28 de julio de 2005, el Procurador General presentó su alegato el 28 de septiembre de 2005 y los esposos Cruz-Medero hicieron lo propio el 5 de octubre de 2005.

El 13 de octubre de 2005, el tribunal apelativo paralizó todos los procedimientos ante el tribunal de instancia. Con el beneficio de la comparecencia de todas las partes, emitió resolución en la que confirmó la actuación del foro apelado. Al negarse a desestimar la petición de adopción presentada por los padres del hogar de crianza, dicho foro apelativo adujo que en atención al bienestar y a los mejores intereses de la menor, la

desestimación del proceso de adopción constituiría una dilación innecesaria y retrógrada.

Oportunamente, el 6 de marzo de 2006, los esposos Cruz-Medero presentaron un recurso de apelación ante nosotros. En esa misma fecha, el Departamento de la Familia presentó su recurso de *certiorari*. El 1ero de mayo de 2006, acogimos el recurso presentado por los esposos Cruz-Medero como un recurso de *certiorari*. Dicho caso fue identificado con el número AC-2006-013. El 12 de mayo de 2006, ordenamos la consolidación de dicho caso con el recurso presentado por el Departamento de Familia, el cual identificamos con el número CC-2006-219.

Con el beneficio de los alegatos del Departamento de la Familia, el Procurador General, los señores Maldonado-Rivera y los esposos Cruz-Medero, el caso quedó sometido en los méritos el 5 de octubre de 2006.

**II.**

En sus recursos, tanto el Departamento de la Familia como los esposos Cruz-Medero, sostienen que erró el Tribunal de Apelaciones al negarse a desestimar la petición de adopción presentada por los señores Maldonado-Rivera. Entienden que dicha petición es prematura pues los señores Maldonado Rivera no han cumplido con el trámite administrativo ante el Departamento de la Familia que incluye que éstos soliciten ser considerados como padres adoptivos y cumplan con un período de supervisión. El Departamento indica además que la petición de adopción es

contraria al plan de permanencia de la menor que, alegadamente, vislumbra colocar a la menor con familiares. Arguye que es imprescindible celebrar una vista sobre el plan de permanencia de la menor. Por tanto, solicita que desestimemos el pleito de adopción de los padres de crianza y la demanda de custodia de los abuelos.

Por su parte, el Procurador General alega que debido a que ni los abuelos paternos de la menor ni los padres de crianza de ésta han cumplido con los requisitos para convertirse en candidatos a padres adoptivos, se debe celebrar una vista en la que se discuta el plan de permanencia de la menor como un incidente dentro del pleito de maltrato.

Indica el Procurador General que la solicitud de custodia de los esposos Cruz-Medero se debe presentar y dilucidar en la vista del caso de maltrato en donde se discutirá el plan de permanencia de la menor. Por tanto, coincide con el Departamento de la Familia, al solicitar que desestimemos sin perjuicio la petición de adopción de los padres de crianza y la demanda de custodia de los esposos Cruz-Medero.

Por su parte, los padres de crianza de la menor, los señores Maldonado-Rivera, alegan que una vez el Departamento les informó que los padres de la menor NACV habían sido privados de la patria potestad, cumplieron con el trámite administrativo que se les requirió en la Unidad de Adopciones para presentar una petición de adopción y que

dicha agencia preparó un informe en el que una trabajadora social concluyó que eran un recurso adecuado para adoptar a la menor.[2]

Estando en posición de resolver, procedemos a así hacerlo.

### III

El presente caso nos permite examinar la interrelación entre el procedimiento para proteger a los menores de edad en situaciones de maltrato, provisto en la "Ley para el bienestar y la protección integral de la niñez", Ley núm. 177, del 1ro de agosto de 2003, 8 L.P.R.A. secs. 444-450m (2006), su antecesora la "Ley para el amparo de menores en el siglo XXI", Ley núm. 342 de 1999, 1999 Leyes de Puerto Rico, 1511-1571 y la de Ley de Adopción, Ley núm. 9 del 19 de enero de 1995, 32 L.P.R.A. secs. 2699-2699s(2004).

Comenzamos por indicar que los hechos del caso ante nuestra consideración se desarrollaron inicialmente bajo la hoy derogada Ley núm. 342. Al amparo de dicho estatuto, el Departamento de la Familia removió a la menor NACV de la custodia de sus padres y le otorgó la custodia provisional de ésta a dicho Departamento. Mientras el Departamento de la Familia realizaba esfuerzos razonables para reunificar a la menor con sus padres, según lo disponía la Ley núm. 342, dicho estatuto fue derogado por la Ley núm. 177 del 1ro de

---

[2] Los señores Maldonado-Rivera presentaron la petición de adopción al amparo de la Ley de Adopción, Ley núm. 9 de 19 de enero de 1995, 32 L.P.R.A. sec. 2699-2699s. Posteriormente, la Unidad de Adopciones del Departamento de la Familia presentó un informe social en el que los recomendó favorablemente para adoptar a la menor NACV.

agosto de 2003. Por tanto, los trámites ulteriores sobre la custodia y patria potestad de la menor NACV se realizaron bajo el palio de la Ley núm. 177, aún vigente. En atención a lo anterior, nos referiremos a ambos estatutos en nuestra discusión, pero resolveremos la presente controversia al amparo de la ley vigente, la Ley núm. 177.

Comenzaremos nuestra discusión con un análisis sobre la evolución de la política pública sobre el maltrato de menores en Puerto Rico.

**A.**

El maltrato infantil es un grave estigma que pesa sobre nuestra sociedad. Es un problema social y de salud de primer orden. Su etiología es de carácter multifactorial y sus repercusiones, inconmesurables. El Estado tiene por lo tanto el deber, no ya legal, sino moral, de proteger a los menores desamparados y víctimas de maltrato. Son éstos los sujetos jurídicos más vulnerables en nuestra sociedad; el Estado tiene que hablar por ellos.

A esos efectos y para facilitar la intervención estatal en casos de maltrato a menores, el legislador ha adoptado una serie de estatutos cuyo denominador común es salvaguardar el bienestar y los intereses de los menores de edad. No empece lo anterior, nuestra política pública sobre maltrato de menores ha sufrido varias transformaciones. Veamos.

En el 1980, se aprobó la Ley de Protección a Menores, Ley núm. 75, 1980 Leyes de Puerto Rico 194-214. Dicho estatuto le impuso al Estado la responsabilidad de implantar programas conducentes a fortalecer los lazos familiares. Según dicho esquema estatutario, sólo cuando fuese imposible proveer un hogar seguro para los menores de edad y luego de haber provisto los servicios adecuados, procedía remover al menor de su familia biológica. *Id*. *Véase además*, *Pueblo en interés menores R.P.S. et al.*, 134 D.P.R. 123, 133 (1993). Bajo el palio de dicha ley, nuestra política pública enfatizaba que el hogar era el lugar ideal para el desarrollo de los menores de edad. *Pérez Ex Parte v. Depto. de la Familia, 147* D.P.R. 556, 563 (1999) *(citas omitidas)*.

En el 1995, el legislador enmendó la Ley de Protección de Menores. *Véase* Ley núm. 8 de 19 de enero de 1995, 1995 Leyes de Puerto Rico, 46-59. Mediante dicho estatuto se estableció que el Estado debía evitar la remoción del menor de su hogar. Además, el Estado debía fomentar la rehabilitación de la familia siempre que esto no implicara poner en riesgo la seguridad del menor. *Id*. pág. 56; *Pérez Ex Parte supra* pág. 564.

Cuatro años más tarde, se aprobó la Ley núm. 342 de 1999, *supra* conocida como la "Ley para el amparo de menores en el siglo XXI". Dicho estatuto reenfocó la política pública de protección a menores y estableció que el derecho a la unidad familiar estaba limitado por el derecho que

tienen los menores a ser protegidos de maltrato. 1999 Leyes de Puerto Rico, 1514. Tras la aprobación de la Ley núm. 342, nuestra política pública se enfocó en proteger a los menores de la "inestabilidad y la falta de permanencia" de la que sufren los menores que son removidos de sus hogares. Art. 3 Ley núm. 342, 1999 Leyes de Puerto Rico, 1523. A estos efectos, el artículo 3 de la Ley núm. 342 estableció que el Estado debería proveer mecanismos para:

> la privación de la patria potestad en el menor término posible luego de que los esfuerzos de rehabilitación y reunificación han sido descontinuados y la privación resulte en el mejor interés del menor; eliminar la necesidad de que los menores esperen durante tiempo irrazonable a que sus padres corrijan las condiciones que les impiden regresar a sus familias[;] y promover la adopción de menores dentro de familias estables en vez de permitir que permanezcan en la inestabilidad del cuidado sustituto. *Id*.

De esta forma, a pesar que el bienestar del menor seguía siendo el interés preeminente de nuestra política pública, en lugar de aspirar a reunificar al menor con su familia, la prioridad del Estado era flexibilizar el proceso de privación de patria potestad para facilitar la adopción en los casos en los que no se lograse rehabilitar a los padres.

Finalmente, en el 2003, con la aprobación de la Ley para el bienestar y protección integral de la niñez, Ley núm. 177 de 2003, se efectuó una abarcadora reforma para reenfocar la política pública sobre el maltrato a menores. Con la aprobación de este estatuto, el legislador reflejó

su preocupación con la efectividad de la Ley núm. 342. En tal sentido, se expresó que: "[e]n ocasiones, al aplicarse la Ley 342, … algunos menores son removidos de sus familias sin tomarse en consideración todos los factores presentes. A[u]n cuando éste no era el resultado que se esperaba al aprobarse la ley, el efecto en estos casos no es otro que la doble victimización de los menores ya que se hace más difícil mantener la familia unida, conservar los vínculos con la familia biológica o lograr la reunificación del menor y sus padres." Exposición de Motivos, Ley núm. 342, *Id*.

Con dicha preocupación en mente, la Ley núm. 177 estableció que los esfuerzos del Estado para garantizar el mejor interés y bienestar de los menores deberían facilitar la conservación de la unidad familiar y proveer "oportunidades y esfuerzos razonables que permitan conservar los vínculos familiares y comunitarios cuando ello no les perjudique". Artículo 3, Ley núm. 177.

En resumen, desde el 1980, nuestra política pública sobre el maltrato a menores se ha encaminado a proteger los mejores intereses y el bienestar de los menores de edad. No obstante, bajo el esquema estatutario de la Ley núm. 342, se favorecía facilitar el proceso de privación de patria potestad, mientras que bajo la ley vigente, se favorece reunificar a los menores con su familia y fortalecer los lazos familiares, al estimar el legislador y

su propulsor el Departamento de la Familia, que de esta forma se velaba por el mejor bienestar del menor.

Con este trasfondo en mente, pasamos a examinar las disposiciones de la Ley núm. 342 y la Ley núm. 177.

**B.**

Tanto la hoy derogada Ley núm. 342, como la Ley núm. 177, facultan al Departamento de la Familia para intervenir en casos de malos tratos a menores.  En términos generales, ambos estatutos autorizan al Departamento de la Familia a acudir al Tribunal de Primera Instancia para obtener la custodia legal de un menor;[3] requieren que el Departamento adopte un plan de permanencia para todo menor colocado en un hogar sustituto con el fin de proveerle estabilidad y seguridad a éste;[4] y exigen que el Departamento realice esfuerzos razonables durante un período de tiempo determinado para reunificar al menor con su familia.[5] Además, cuando no sea posible reunificar al menor con su familia, ambos estatutos proveen para que el Departamento inicie un procedimiento de privación de patria potestad.[6]

---

[3] *Véase* artículo 31de la Ley núm. 177 de 2003, 8 L.P.R.A. sec. 447 y artículos 35 y 36 de la Ley núm. 342 de 1999, 1999 Leyes de Puerto Rico, 1546-1551.

[4] Sobre los planes de permanencia *véanse* artículos 1, 11, 12,42 y 50 de la Ley núm. 177 de 2003, 8 L.P.R.A. secciones 444, 444h, 444i, 447k y 447s y los artículos 2, 25, 26, 38 y 46 de la Ley núm. 342 de 1999, 1999 Leyes de Puerto Rico.

[5] *Véase* artículo 50 de la Ley núm. 177 de 2003, 8 L.P.R.A. sec. 447s y el artículo 46 de la Ley núm. 342 de 1999, 1999 Leyes de Puerto Rico, 1546-1551.

[6] *Véase* artículo 52 de Ley núm. 177 de 2003, 8 L.P.R.A. sec. 447u y el artículo 47 de Ley núm. 342 de 1999, 1999 Leyes de Puerto Rico, 1562.

Según el artículo 31 de la Ley núm. 177, al enfrentarse a una situación de maltrato a menores, el Tribunal de Primera Instancia tiene jurisdicción para emitir órdenes protectoras, otorgar la custodia de emergencia provisional o permanente y privar a los padres del ejercicio de la patria potestad.[7] *Véase además*, artículo 42 de la Ley núm. 177, 8 L.P.R.A. sec 447. Al amparo de dicha facultad, el artículo 43 de la Ley núm. 177 le permite al tribunal privar a los padres o encargados de la custodia del menor por un lapso de tiempo no mayor de seis (6) meses que luego puede ser prorrogado hasta un máximo de un año. 8 L.P.R.A. sec. 447l. En esos casos, el tribunal puede colocar al menor con un familiar o puede otorgar la custodia física de éste a un hogar de crianza debidamente certificado. *Id*.

Bajo dichos estatutos, una vez el tribunal determina que procede remover al menor de su hogar, el Departamento viene obligado a adoptar un plan de permanencia para el menor. Además, como veremos, el Departamento está obligado a realizar esfuerzos razonables para reunificar al menor con su familia.

En cuanto a la adopción de un plan de permanencia para el menor, la Ley núm. 342 disponía que dicho plan podía incluir reunificar al menor con su familia; el inicio de un

---

[7] De igual modo, el artículo 36 de la Ley núm. 342 indicaba que el tribunal podía otorgarle la custodia legal del menor al Departamento de la Familia y la custodia *de facto* a otra persona; o colocar al menor en un hogar de crianza debidamente licenciado o certificado. 1999 Leyes de Puerto Rico, 1551.

proceso de privación de patria potestad para propósitos de adopción; otorgar la custodia del menor a una persona apropiada; y colocar al menor en un hogar de crianza. Artículo 2(aa), 1999 Leyes de Puerto Rico, 1521. Además, dicha ley proveía para la adopción de un plan de permanencia concurrente que se definía como "Un plan diseñado para un menor a ser implantado simultáneamente con otras alternativas para garantizar la estabilidad y sentido de permanencia de éste." *Id.* De igual modo, bajo la Ley núm. 177, el plan de permanencia implica "el diseño y ejecución de actividades con el/la menor y su familia dirigidas a lograr la estabilidad, seguridad y mejor interés del/a menor, tomando en consideración los recursos existentes." Art. 1(cc), 8 L.P.R.A. sec. 444.

Sobre los esfuerzos razonables para reunificar al menor con su familia, la Ley núm. 177 dispone que dichos esfuerzos se deben realizar por un período no mayor de doce (12) meses. Artículo 50 de la Ley núm. 177, 8 L.P.R.A. sec 447s. Esto, en contraste con la Ley núm. 342 que sólo exigía que el Departamento realizara dichos esfuerzos razonables por un período de tiempo no mayor de seis (6) meses. Artículo 46 de la Ley núm. 342, 1999 Leyes de Puerto Rico, 1558.[8]

---

[8] Según surge de la exposición de motivos de la Ley núm. 177 de 2003, el legislador consideró que el término de seis (6) meses para realizar esfuerzos razonables de reunificación familiar era muy corto. A estos efectos, dicha exposición de motivos dispone que "la Ley establece términos muy cortos para completar esfuerzos razonables. Estos términos ignoran la evidencia científica acumulada en

Durante dicho proceso, el Departamento tiene el deber de rendir informes periódicos de evaluación sobre el progreso del menor y los servicios provistos a la familia. 8 L.P.R.A. sec. 447j. Dichos informes además, deben incluir recomendaciones sobre el curso a seguir con el plan de servicios del menor.[9] *Id.* Sin embargo, como hemos visto, el Departamento no está obligado a realizar esfuerzos razonables de forma indefinida y tampoco debe retener la custodia legal del menor por un período largo de tiempo. En atención a esto, al igual que su antecesora, la Ley núm. 177 enumera las instancias en las que no se harán esfuerzos razonables para reunir al menor con su familia. A manera de ejemplo, el tribunal puede eximir al Departamento de hacer esfuerzos razonables cuando:

> (a) Los esfuerzos para cambiar el comportamiento del padre, de la madre o persona responsable del menor no han sido exitosos luego de doce (12) meses de haberse iniciado el plan de servicios según la evidencia presentada en el caso.
> (b) Cuando un padre, una madre o persona responsable del menor ha manifestado no tener interés en la reunificación con el menor. Artículo 50, Ley núm. 177, 8 L.P.R.A. sec. 447s; *Véase* además, Artículo 46, Ley núm. 342 de 1999, 1999 Leyes de Puerto Rico, 1558-1562.

Por otro lado, **el artículo 42 de la Ley núm. 177 establece que el Tribunal debe celebrar una vista de disposición final del caso de maltrato en un período no**

---

numerosos estudios sobre maltrato y violencia en las familias y contradicen la realidad de la dinámica del maltrato infantil".

[9] Bajo el esquema de la Ley núm. 342 el Departamento tenía que realizar esfuerzos razonables para reunificar al menor con su familia y, de forma concurrente, debía realizar esfuerzos para colocar al menor en adopción. Artículo 46, 1999 Leyes de Puerto Rico, 1558.

**menor de doce (12) meses,** contados a partir de que el Departamento obtuvo la custodia provisional del menor. 8 L.P.R.A. sec. 447k. **Además, en casos como el presente, en los que el Departamento hubiese adoptado un plan de permanencia para un menor con anterioridad a la aprobación de la Ley núm. 177, dicha vista de disposición final de permanencia se debe celebrar en un período no mayor de seis (6) meses desde que se aprobó el referido plan.** *Id.* Vemos como, la vista de disposición final es un requisito de la Ley núm. 177.

Finalmente, en los casos en que luego de realizarse los esfuerzos razonables el tribunal determina que el menor no puede regresar a su hogar, el Secretario de la Familia tiene la facultad de promover la ubicación del menor en un hogar adoptivo. Art. 13 Ley núm. 177, 8 L.P.R.A. sec. 44j. Como parte de dicho proceso, el Departamento también tiene la facultad de iniciar un procedimiento de privación de patria potestad. Art. 42 Ley. num. 177, 8 L.P.R.A. sec. 447k.

Como hemos visto, la Ley núm. 177 establece el proceso a seguir luego de que se remueve a un menor de edad de su hogar. En dicho proceso, el Estado puede colocar al menor en un hogar de crianza mientras intenta reunificar al menor con su familia. De esto no ser posíble, el Departamento puede optar por implementar un plan permanente para el menor que puede incluir ubicarlo en un hogar adoptivo.

Veamos entonces las disposiciones legales aplicables a los hogares de crianza y los estatutos y reglamentos que rigen la adopción en nuestra jurisdicción.

**IV.**

**A.**

En cumplimiento con el deber del Estado de proveer un hogar seguro a los menores cuyos padres o familiares fallan en brindarles los cuidados que los menores de edad necesitan, el Departamento de la Familia tiene la facultad de otorgar licencias a personas dedicadas a colocar niños en sus hogares. 8 L.P.R.A. secs. 81-81i. Estos programas de hogares de crianza se ofrecen a través de la Administración de Familias y Niños y se rigen por el Reglamento para el licenciamiento y supervisión de hogares de crianza, Reglamento núm. 6476 del 13 de junio del 2002 y el Manual de normas y procedimientos para los servicios del programa de servicios a familias con niños, cap. VI, última revisión del 16 de marzo de 1984, (en adelante, "Manual de normas y procedimientos").

En esencia, la misión de los hogares de crianza es "proporcionar un ambiente familiar y condiciones de vida que propicien el desarrollo normal de los niños y jóvenes … [y] brindar protección a los niños y jóvenes que han sufrido experiencias indeseables". Manual de normas y procedimientos, *supra* Cap. VI. pág. 3. En el hogar de crianza, el menor recibe los cuidados necesarios hasta que pueda retornar a sus padres, se determine que debe vivir

con familiares o se le coloque en un hogar adoptivo. *Id.* pág. 6. *Véase además, Rodríguez v. Depto. Servicios Sociales*, 132 D.P.R. 617, 625 (1993).

La ley núm. 177 define un hogar de crianza como un "lugar que se dedique al cuidado sustituto de no más de seis (6) niños/as provenientes de otros hogares o familias durante las veinticuatro horas del día, en forma temporera. Es aqu[é]l hogar que ha sido objeto de estudio, certificación o licenciamiento y está bajo la supervisión del Departamento". Artículo 1, 8 L.P.R.A. sec. 444. Por lo tanto, toda persona que desee operar un hogar de crianza debe tener una licencia para esos fines, expedida por el Secretario de la Familia. 8 L.P.R.A. sec. 81. Estos hogares pueden recibir subvención por sus servicios o pueden ser gratuitos. Manual de normas y procedimientos, *supra* págs.5-6.

Al acoger a un menor de edad en su hogar, los padres de crianza aceptan que sus servicios se utilizarán de forma temporera. Reglamento para el licenciamiento y supervisión de hogares de crianza, *supra*, sec. 9.1. A estos efectos, los padres del hogar de crianza prestan sus servicios según los términos establecidos en el "Convenio de servicios a prestar en un hogar sustituto y en un hogar o centro de cuidado diurno", el cual dispone que los servicios de hogar de crianza son temporeros. Manual de normas y procedimientos, *supra,* pág. 65; *Hidalgo v. Depto. de Servicios Sociales,* 129 D.P.R. 605, 616 (1991).

Debido a que el propósito rector de nuestra política pública en torno al maltrato de menores es que, de ser posible, el menor que es removido de su hogar retorne al mismo, las disposiciones reglamentarias sobre los hogares de crianza disponen que la estadía del menor en el hogar de crianza no debe ser mayor de dos años. Manual de normas y procedimientos *supra*, pág. 7.

Una vez el Departamento coloca a un menor en un hogar de crianza, dicha agencia tiene que elaborar un plan de permanencia que le permita al menor regresar a su hogar. Manual de normas y procedimientos, *supra,* págs. 8-9. De esto no ser posible, debe adoptar un plan de permanencia alterno. *Id.* Entre los diversos planes de permanencia que el Departamento puede adoptar para un menor se encuentran: a) el retorno con los padres o encargados; b) colocación con otros familiares; c)adopción; d)hogar de crianza formalizado; o e) independencia socio-económica. *Id.,* págs. 9-11. Según indican los manuales del Departamento de la Familia y en atención a los propósitos que inspiraron la adopción de la Ley núm. 177, el plan de permanencia ideal es el retorno del menor con sus padres. De esto no ser posible, se favorece entonces la colocación con familiares. Cuando esas opciones no están disponibles, se favorece la adopción. *Id.*

Veamos los contornos de la adopción en Puerto Rico.

**B.**

El Estado, como parte de su poder *parens patriae*, puede utilizar el mecanismo de la adopción para proveer un hogar estable, saludable y seguro a los menores de edad que han sido removidos de sus hogares y que no pueden retornar a éstos. Sin embargo, en atención al interés de salvaguardar el bienestar de los menores abandonados y maltratados, el Estado puede adoptar reglamentación apropiada para asegurarse de que la adopción es la alternativa idónea para un menor que está bajo su custodia y para escoger los padres adoptivos que mejor pueden suplir las necesidades afectivas, sociales y económicas del adoptando. *Véase*, *López Rivera v. E.L.A.*, 2005 TSPR 102, 164 D.P.R.__; *Virella v. Proc. Esp. Rel. Fam.*, 154 D.P.R. 742, 753 (2001).

El procedimiento para obtener un decreto judicial de adopción comienza con la presentación de una petición juramentada a esos efectos. 32 L.P.R.A. sec. 2699b. Por disposición expresa de nuestra ley de adopción, Ley núm. 9 de 1995, este procedimiento no se puede consolidar con ningún otro. *Id.* En su discreción, el tribunal puede permitir la intervención de cualquier parte interesada. *Id.*

Habida cuenta de que el Departamento de la Familia es la agencia llamada a velar por los intereses de los menores de edad, nuestra Ley de Adopción, Ley núm. 9 de 19 de enero de 1995, requiere que se notifique del proceso al

Secretario de la Familia quien tiene la obligación de preparar un estudio social pericial que ayudará al tribunal en la adjudicación de la petición de adopción.   32 L.P.R.A. sec. 2699c(3).   En dicho informe, el Departamento realiza un análisis del historial social de los peticionarios, del menor y de sus padres biológicos e incluye recomendaciones sobre si procede decretar la adopción o si por el contrario, el menor debe permanecer bajo la custodia del Departamento.   *Id.,* 32 L.P.R.A. sec. 2699e(1).

Por otro lado, el artículo 4 de la Ley de Adopción dispone que tanto el tutor o custodio del menor, como los abuelos del adoptando huérfano de padres, tendrán derecho a ser oídos en el procedimiento de adopción.   32 L.P.R.A. sec. 2699c(6).   Por su parte, el artículo 138 del Código Civil dispone que el Secretario del Departamento de la Familia tiene el deber de consentir a la adopción cuando el menor esté bajo su custodia y cuidado y sus padres hayan sido privados de la patria potestad.   31 L.P.R.A. sec. 535. Los abuelos del menor tendrán que consentir a la adopción cuando los padres biológicos sean menores de edad emancipados.   *Id.*   Finalmente, el artículo 135 del Código Civil dispone que:

> El Secretario del Departamento de la Familia podrá iniciar a nombre de un adoptante un procedimiento de adopción de un menor que está bajo su custodia cuando entienda que ello conviene a los mejores intereses y bienestar del menor, siempre que los padres o tutores hayan renunciado a la patria potestad o tutela o cuando el tribunal los haya privado de la patria potestad o custodia por algunas de las causas que establece este Código.   31 L.P.R.A. sec. 536.

Se desprende de la normativa antes reseñada que, cuando el Departamento de la Familia ostenta la custodia de un menor de edad, dicha agencia tiene el deber de consentir a la adopción y tiene la facultad de presentar la petición de adopción en nuestros tribunales.  En cumplimiento con dicho deber, el Departamento de la Familia ha adoptado una serie de normas y reglamentos que rigen la fase administrativa previa a la presentación de una petición de adopción de un menor que se encuentra bajo la custodia del Departamento.  Dicho proceso se rige por el Reglamento para los servicios de adopción y adopción subsidiada del Departamento de la Familia, Reglamento núm. 6109 del 5 de marzo de 2000 y el Manual de Normas y Procedimientos para los servicios de familias con niños, Cap. VII, servicios de adopción, del 5 de marzo de 2000, (en adelante, "Manual de normas y procedimientos sobre servicios de adopción").  Veamos.

El servicio de adopción provisto por el Departamento comienza cuando los padres biológicos, el representante legal del menor, o el Departamento de la Familia deciden que la adopción es el plan más apropiado para el menor. Manual de normas y procedimientos sobre servicios de adopción *supra*, sec. 108, pág. 14.  Una vez se determina que la adopción es la alternativa adecuada para un menor, el Departamento procede a escoger un hogar adoptivo.

A través de sus trabajadoras sociales, el Departamento selecciona los padres adoptivos que mejor pueden satisfacer

las necesidades de los menores de edad; escoge los candidatos a ser adoptados; somete a los candidatos a padres adoptivos a una serie de talleres y orientaciones; coloca al menor en el hogar adoptivo; supervisa las relaciones entre los padres adoptivos y el menor; y autoriza a los padres adoptivos a presentar una petición formal de adopción ante el tribunal. *Veáse* Reglamento para los servicios de adopción *supra* y el Manual de normas y procedimientos sobre servicios de adopción, *supra*.

Un hogar adoptivo, según indica el Artículo 3(u) del Reglamento para los servicios de adopción, es el "hogar de una familia de uno o más miembros que ha sido estudiado y/o aprobado por el Departamento o por una agencia licenciada por el Departamento para recibir un menor en adopción." Para cualificar como hogar adoptivo, los interesados tienen que tomar un adiestramiento de adopción y paternidad responsable; asumir todas las responsabilidades que conlleva la paternidad, salvo la patria potestad; y recibir las visitas de supervisión. Artículo 7, Reglamento para los servicios de adopción, *supra*.

De igual modo, el procedimiento administrativo para convertir a los padres de crianza en padres adoptivos se rige por los reglamentos del Departamento de la Familia. Este procedimiento administrativo comienza cuando el trabajador de servicios que supervisa al menor en el hogar de crianza determina que el plan de permanencia que mejor conviene al menor es la adopción. Manual de normas y

procedimientos sobre servicios de adopción *supra*, sec. 402.4, pág. 58.

Una vez los padres de crianza solicitan convertirse en padres adoptivos, el trabajador social refiere el caso a la Unidad de Adopción para que se realice un estudio social con el fin de determinar si se recomienda que los padres del hogar de crianza se conviertan en candidatos padres adoptivos. *Id.* Cuando dicho informe social resulta favorable, los padres del hogar de crianza se convierten en padres adoptivos potenciales. *Id.*, pág. 59. De ser escogidos como candidatos a padres adoptivos, el Departamento procede a descontinuar el pago de la subvención del hogar de crianza. Luego, los padres adoptivos deben completar un período de supervisión al cabo del cual el Departamento estará en posición de autorizar que éstos presenten una petición de adopción en el tribunal de instancia. *Id.,* pág. 58.

Las normas del Departamento establecen que dicha agencia puede autorizar que los padres de crianza presenten una petición de adopción si el menor ha convivido con ellos por un término no menor de seis (6) meses; de esto no haber ocurrido, el Departamento debe supervisar las relaciones entre el menor y los potenciales padres adoptivos por un período de seis (6) meses. *Id.,* pág. 59.

Por otro lado, cuando el solicitante desea adoptar a un menor que tiene bajo su custodia o tutela, éste debe recibir una orientación del trabajador social sobre los

requisitos legales para adoptar y las implicaciones del proceso. *Id.*, sec. 503.2 (c), pág. 86. En estos casos, luego de cumplir con el procedimiento administrativo ante el Departamento de la Familia, los potenciales padres adoptivos, con la anuencia del Departamento, están legitimados para presentar una petición de adopción.

Cuando los solicitantes no tienen la custodia *de facto* o la tutela del menor, éstos tienen que cumplir con el procedimiento dispuesto por el Departamento de la Familia para que se les considere como candidatos adoptivos. *Véase* Manual de normas y procedimientos sobre servicios de adopción *supra*, sec.503.2 De cualificar para padres adoptivos, el Departamento procede a colocar al menor de edad en el hogar de éstos por un término de entre seis (6) y doce (12) meses. *Véase* Manual de normas y procedimientos sobre servicios de adopción *supra*, secs. 500-503. Un mes antes de finalizar el procedimiento de supervisión, el Trabajador Social orienta a los padres adoptivos para que éstos presenten una petición de adopción. *Id.* secs.600-604.

Con este marco doctrinal en mente, procedemos a examinar los hechos del presente caso.

**V.**

El 27 de mayo de 2003, el Departamento de Familia obtuvo la custodia provisional de la menor NACV. Para esa fecha, los esposos Cruz-Medero no pudieron hacerse cargo de su nieta. Sin embargo, en el mes de mayo de 2004, tras

enterarse de que los padres de la menor serían privados de la patria potestad, los esposos Cruz-Medero, expresaron interés en asumir la custodia de la menor. Ante esta situación, **el Departamento de la Familia los recomendó favorablemente para asumir la custodia de su nieta.**

En la vista celebrada el 17 de agosto de 2004, el Tribunal de Primera Instancia privó a los padres de la menor del ejercicio de la patria potestad y otorgó la custodia legal permanente al Departamento de la Familia. A pesar de que el Departamento de la Familia estaba considerando a los abuelos paternos de la menor como un recurso adecuado para asumir su custodia, el tribunal no hizo una determinación en torno a si procedía otorgarle la custodia de la menor a éstos. Tampoco indicó si procedía colocarla en un hogar adoptivo.

La ausencia de una determinación final sobre el plan de permanencia de la menor creó una situación de incertidumbre que desató la pugna judicial a la que nos enfrentamos en el presente caso. Dicha lucha judicial encaminada a obtener la custodia de la menor NACV, comenzó cuando los padres de crianza de ésta presentaron una petición de adopción ante el tribunal de instancia sin acogerse al procedimiento administrativo que disponen los reglamentos y normas del Departamento de la Familia. En respuesta a dicha actuación, los esposos Cruz-Medero, abuelos de la menor, presentaron una petición de custodia y dos (2) peticiones de adopción.

Del cuadro fáctico antes descrito se desprende con meridiana claridad que el desempeño del Departamento de la Familia en este caso no ha sido el más adecuado. En gran medida, las acciones del Departamento han dilatado y complicado innecesariamente este caso. El Departamento solicitó que se archivara el caso de maltrato a pesar de que no se había provisto finalmente para el plan de permanencia de la menor. Ahora nos argumenta que procede reabrir el mismo.

El Departamento de la Familia tiene el deber, legal y moral, de tramitar los casos de maltrato de menores de forma eficiente y en cumplimiento con los términos dispuestos en la Ley núm. 177. Esto, para evitar que se prolongue la estadía de un menor de edad en un hogar de crianza sin que se haga una determinación final sobre quién debe asumir su custodia física permanente.

El principio rector de nuestra decisión es el bienestar de la menor NACV quien desde su primer mes de vida ha estado bajo el cuidado de un hogar de crianza. Conscientes de que nuestra decisión tendrá hondas repercusiones en la vida de dicha menor, nos corresponde aclarar la relación entre el deber del Estado de cuidar a los menores maltratados bajo la Ley núm. 177 y nuestro estatuto de adopción.

En vista de que la Ley núm. 177 exige que en todo caso de maltrato el tribunal celebre una vista final de permanencia y habida cuenta de que le corresponde al

Departamento de la Familia iniciar el procedimiento para colocar a un menor en un hogar adoptivo, resolvemos que procede desestimar la petición de adopción presentada por los señores Maldonado-Rivera por prematura.

Ante los hechos del presente caso, entendemos que no se puede tramitar una petición de adopción cuyo propósito es romper todo vínculo entre la menor y su familia biológica, sin que el foro primario haya hecho una determinación final sobre si procedía otorgarle la custodia a los familiares que estaban dispuestos a asumirla; o si, por el contrario, procedía colocarla en un hogar adoptivo.

Contrario a nuestra determinación, el Tribunal de Apelaciones determinó que aun en ausencia de una vista de permanencia, no procedía desestimar la petición de adopción de los señores Maldonado-Rivera. Al así decidir, el foro apelativo intermedio determinó que luego de no poder ubicar a la menor con sus familiares, el Departamento de la Familia descartó implementar el plan de permanencia que vislumbraba ubicar a la menor con su familia y activó, *sub silentio*, el plan concurrente de adopción.

Varias consideraciones nos llevan a discrepar de la conclusión del foro apelado. Por un lado, no encontramos evidencia en el récord que nos permita concluir que el Departamento de la Familia activó el plan concurrente de adopción. Todo lo contrario, observamos que el Departamento estaba considerando a los abuelos como recursos para la menor y, hasta recomendó que el tribunal

le otorgase la custodia de la menor a éstos. Además, la omisión de celebrar una vista de permanencia nos impide determinar cuál era el plan de permanencia que la agencia vislumbraba activar en el presente caso.

En segundo lugar, reiteramos que el procedimiento de adopción de un menor que se encuentra bajo la custodia del Estado no es un procedimiento puramente privado. Véase, *Vargas Crespo v. Soler de la* Rosa, 2003 TSPR 182, 160 D.P.R.__, res. 30 de diciembre de 2003, 2007 TSPR)); 170 D.P.R. __;[10] *Bárbara Estrella v. Figueroa Guerra*, res. 26 de marzo de 2007. A estos efectos, hemos establecido que en nuestra jurisdicción existen dos tipos de procedimientos de adopción: uno privado y otro público. *Bárbara Estrella v. Figueroa Guerra*, *supra*.[11] En el procedimiento público, la intervención del Estado tiene su génesis en la remoción del

---

[10] En *Vargas Crespo v. Soler de la Rosa*, 2003 TSPR 182, el Departamento de la Familia había presentado una petición de remoción de custodia al amparo de la Ley núm. 342 de 1999. Antes de que se ordenara dicha remoción, la madre entregó voluntariamente a su hija al hogar sustituto de sus tíos. Ante dicha situación, determinamos que el pleito de adopción no era uno propiamente entre partes privadas, por lo que el Tribunal debió requerir la participación del Departamento en el caso.

[11] En dicho caso, atendimos el conflicto entre la naturaleza y propósitos de Ley núm. 177 sobre maltrato de menores y nuestra Ley de adopción. Al examinar una situación de hechos en la que los padres de crianza de la menor presentaron una petición de privación de patria potestad y adopción antes de que el Departamento de la Familia hubiese concluido los esfuerzos razonables para reunificar al menor con su madre biológica, determinamos que dicha petición de adopción y privación de patria potestad era prematura. De esta forma, determinamos que antes de iniciar el procedimiento de adopción era necesario culminar los procedimientos en el caso de maltrato al amparo de la Ley núm. 177.

menor de su hogar al amparo de los estatutos de maltrato; mientras que en el procedimiento privado, el Estado interviene a *posteriori*, luego de que dos personas privadas deciden adoptar.

El procedimiento privado de adopción se inicia cuando los padres adoptivos y los padres biológicos presentan una petición de adopción en el tribunal. En ese procedimiento de carácter privado, la Ley de Adopción requiere que el Departamento de la Familia intervenga para preparar un estudio social pericial que el tribunal podrá utilizar como guía al examinar la petición de adopción. 32 L.P.R.A. sec. 2699e(1).

Por el contrario, en el procedimiento de adopción que se inicia al amparo de nuestros estatutos de maltrato, la participación del Departamento rebasa los linderos de la preparación de un informe social pericial. En dicho proceso, el Departamento adquiere la condición de parte, pues no sólo tiene la facultad de decidir si la adopción es la alternativa apropiada para el menor, sino que tiene la responsabilidad de consentir a la adopción. *Véase* Reglamento para los servicios de adopción *supra* y el Manual de normas y procedimientos sobre servicios de adopción *supra*; *Bárbara Estrella v. Figueroa Guerra, supra*.[12]

---

[12] Además, el artículo 135 del Código Civil de Puerto Rico que faculta al Departamento de la Familia a presentar una petición de adopción a nombre de los padres adoptivos, cuando los padres hayan renunciado a la patria potestad o cuando el tribunal los haya privado de ésta por algunas de las causas de establece dicho Código. 31 L.P.R.A. sec. 536.

En vista de lo anterior, resolvemos que, cuando el Estado interviene con un menor y obtiene la custodia legal de éste, cualquier procedimiento futuro de adopción se rige, en primera instancia, por la Ley núm. 177 y por las normas y reglamentos que el Departamento de la Familia adopte. La segunda fase de dicho proceso, la etapa judicial, se rige por nuestra Ley de Adopción y comienza una vez los potenciales padres adoptivos han cumplido con el proceso administrativo dispuesto por el Departamento de la Familia.

A la luz de lo anterior, concluimos además que en casos como el presente, antes de presentar una petición al amparo de nuestra ley de Adopción, se debe culminar el procedimiento dispuesto en la Ley núm. 177 sobre maltrato de menores. Además, las personas interesadas en adoptar a un menor cuya custodia legal se encuentra en las manos del Departamento de la Familia, deben cumplir con el procedimiento administrativo dispuesto por el Estado para convertirse en padres adoptivos. De esta forma, se salvaguarda la facultad del Departamento de la Familia de decidir cuándo la adopción es la opción que adecuada para un menor que se encuentra bajo su custodia, conforme exige la Ley núm. 177 y la política pública allí establecida.

Por otro lado, discrepamos de la determinación del foro apelado a los efectos de que corresponde al tribunal de instancia, dentro del procedimiento de adopción, examinar si se incumplió con el procedimiento

administrativo. Esta solución permitiría darle curso al procedimiento judicial de adopción sin cumplir con el mandato de la Ley núm. 177 que requiere se celebre una vista final sobre el plan de permanencia de un menor; eviscerando de esta forma dicho estatuto. Además, socavaría la facultad del Departamento de la Familia de determinar si procede colocar a un menor en un hogar adoptivo.

Al determinar que procede desestimar la petición de adopción presentada por los señores Maldonado-Rivera, pretendemos evitar que las personas interesadas en adoptar a un menor que se encuentra bajo la custodia legal del Estado, soslayen el procedimiento dispuesto por el Departamento de la Familia y de esta forma impidan que la agencia ejerza su autoridad como custodio y tutor del menor.

En segundo lugar, no podemos olvidar que la decisión final en todo proceso en el cual el Estado remueve a un menor de su hogar debe ser producto de un análisis ponderado que tome en cuenta los intereses del menor y los recursos disponibles para su cuidado. Si elaboramos un sistema en el que cualquier parte interesada puede presentar sucesivas peticiones de adopción y custodia como si este proceso fuese una especie de subasta que se adjudica al mejor postor, estaríamos socavando los propósitos de la Ley núm. 177 sobre maltrato de menores, estatuto que busca proteger los intereses del menor y

asegurar que se adopte el plan de permanencia más apropiado para éste.

**Nuestra decisión no pretende desvirtuar el carácter flexible y expedito del procedimiento de adopción.** Tampoco se pretende hacer de estos procedimientos, unos de tal naturaleza engorrosos, que se hagan poco atractivos para quienes interesen adoptar una niña. Sin embargo, al igual que determinamos en *Estrella v. Figueroa Guerra, supra*, entendemos que cuando el Estado ha intervenido con un menor bajo los estatutos de maltrato, el procedimiento de adopción de dicho menor no se rige exclusivamente por la Ley de Adopción. Por lo tanto, antes de iniciar un procedimiento bajo la Ley de Adopción, se debe culminar el procedimiento dispuesto en la Ley núm. 177.

Habida cuenta de que nuestra política pública sobre maltrato de menores favorece mantener los lazos entre el menor y su familia, no podemos obviar el hecho que la adopción de la menor NACV por sus padres de crianza rompería los lazos familiares de ésta con sus abuelos. Esto, a pesar de que existe la opción de mantener esos lazos entre la menor y sus abuelos. Debido a que la adopción no es la única opción disponible para la menor NACV, somos del criterio que sus intereses estarán mejor servidos si permitimos que el tribunal de instancia celebre una vista en la que dicho foro tenga la oportunidad de considerar las diferentes opciones disponibles para la menor.

En vista de lo anterior, concluimos que erraron los tribunales apelados al negarse a desestimar la petición de adopción presentada por los padres de crianza. **Procede entonces reabrir el caso de maltrato num. NSRF 2003-00685 para permitir que el foro primario celebre una vista de permanencia**. Como corolario de esta determinación, procede desestimar sin perjuicio la demanda de custodia presentada por los abuelos paternos de la menor, caso núm. NSFR 2004-1287 y el pleito de adopción presentado por éstos, caso núm. NSFR 2005-647.

En la vista de permanencia, los señores Maldonado-Rivera podrán, a discreción del tribunal, ejercitar su derecho a ser oídos para manifestar su interés en adoptar a la menor. Art. 47, Ley núm. 177, 8 L.P.R.A. sec.447p. Por su parte, el Departamento de la Familia deberá presentar los correspondientes informes sociales actualizados en los que podrá recomendar cuál es el plan de permanencia que mejor conviene a las intereses de la menor NACV.[13]

---

[13] Debido a que lo anterior dispone de la controversia ante nuestra consideración, es innecesario discutir el primer señalamiento de error de los señores Cruz-Medero en su recurso. Éstos alegaron que el tribunal de instancia no tenía "jurisdicción para continuar con la petición de adopción presentada por el hogar de crianza, ya que al momento de presentarse la misma[,] no existía una sentencia final y firme privando de la patria potestad a los padres biológicos de la niña, razón por la cual resultaba imprescindible que [éstos] fuesen emplazados". Recurso de Certiorari, caso núm. AC-2006-13.

Además, en atención al principio que nos obliga a abstenernos de atender un asunto constitucional cuando se puede resolver el caso en consonancia con los mejores intereses de la justicia, no es necesario que discutamos, como nos solicitan los señores Maldonado-Rivera, si los padres de crianza tienen un interés constitucionalmente

**Devuelto el caso al Tribunal de Primera Instancia para la determinación final sobre el plan de permanencia, este foro deberá celebrar dicha vista prontamente, en cuestión de días no meses. El tribunal velará porque el proceso no se dilate** injustificadamente pues sólo de esta forma --con una vista y adjudicación final del proceso-- es que se hace cumplida Justicia a la menor NACV, sus abuelos paternos y los padres de crianza.

Se dictará sentencia de conformidad con lo aquí establecido.

Anabelle Rodríguez Rodríguez
Juez Asociada

protegido de mantener la integridad de la familia que han creado con la menor NACV. *Véase Domínguez Maldonado v. E.L.A.*, 137 D.P.R. 954, 964 (1995); *P.P.D. v. Admor. Gen. De Elecciones*, 11 D.P.R. 199, 243 (1981); *Molina v. C.R.U.V.*, 114 D.P.R., 295 (1983); E.*L.A. v. Aguayo*, 80 D.P.R. 552, 596 (1958). De igual modo, no entraremos a discutir la alegación de los señores Maldonado-Rivera a los efectos de que nuestra Ley de Adopción, les confiere, como padres de crianza, preferencia par adoptar a la menor NACV.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Lydia Rivera Báez
Luis Maldonado Pola

                         CC-2006-219

Ex Parte                    Cons. con
                               AC-2006-013

SENTENCIA

San Juan, Puerto Rico, a 26 de marzo de 2007

Por los fundamentos expresados en la Opinión que antecede, los cuales se incorporan íntegramente a la presente, concluimos que erraron los tribunales apelados al negarse a desestimar la petición de adopción presentada por los padres de crianza. **Procede entonces reabrir el caso de maltrato num. NSRF 2003-00685 para permitir que el foro primario celebre una vista de permanencia.** Como corolario de esta determinación, se desestima, sin perjuicio, la demanda de custodia presentada por los abuelos paternos de la menor, caso núm. NSFR 2004-1287 y el pleito de adopción presentado por éstos, caso núm. NSFR 2005-647. Se devuelve el caso al Tribunal de Primera Instancia para trámites ulteriores acorde a lo aquí resuelto.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera Pérez hace constar lo siguiente:

"El Juez Asociado señor Rivera Pérez disiente por ser del criterio que tanto el Tribunal de Primera Instancia como el Tribunal de Apelaciones actuaron conforme a derecho cuando

se negaron a desestimar la petición de adopción presentada por los padres del hogar de crianza, esposos Maldonado-Rivera. El actual estado de derecho en materia de adopción y de protección de la niñez, provisto por la Ley Núm. 9 de 19 de enero de 1995, 32 L.P.R.A. secs. 2699-2699s y la Ley Núm. 177 de 1 de agosto de 2003, 8 L.P.R.A. secs. 444-450m permite, contrario a lo resuelto por la Mayoría, que un procedimiento de adopción y uno de privación de custodia permanezcan activos en el trámite judicial. De hecho, en controversias como la presente, es del criterio que lo más apropiado y razonable, cónsono con la política pública de resolverlas de forma expedita, y en beneficio y mejor interés de los menores, es la consolidación de ambos procedimientos, estableciendo el primero contingente al segundo.

Disiente, además, porque la Opinión Mayoritaria desvirtúa y está en clara pugna con el carácter liberal, simple y flexible del procedimiento de adopción, según reformado en el año 1995 mediante la Ley Núm. 9, *supra*. En términos prácticos, contrario al espíritu y clara letra de la referida ley, dicha Opinión convierte nuevamente la alternativa de la adopción en una poco atractiva, en detrimento de los mejores intereses de las víctimas inocentes del maltrato, nuestros niños. Finalmente, estima que es de honda preocupación que se sobreponga a, o se soslaye, la letra clara de la Ley Núm. 9, *supra*, mediante la interpretación de un reglamento y un manual, promulgados en el año 2000, por el Departamento de la Familia, que, a su juicio, son de cuestionable validez constitucional, por invadir, sin autorización legislativa, el ámbito procesal del procedimiento de adopción establecido por estatuto, zona que le está vedada por haber sido ocupada directamente por la Asamblea Legislativa."

El Juez Asociado señor Rebollo López se une a las expresiones del Juez Asociado señor Rivera Pérez.


                              Aida Ileana Oquendo Graulau
                              Secretaria del Tribunal Supremo